UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Newport News Division

FILED

SEP - 9 2011

CLERK, U.S. DISTRICT COURT
NORFOLK, VA

ROMAN DAVIS,

            Plaintiff,

v.                                        Case No. 4:10cv101

NATIONWIDE MUTUAL FIRE
INSURANCE COMPANY,

            Defendant.

**OPINION AND ORDER**

Before the Court are cross-motions for summary judgment. The plaintiff, Roman Davis, filed a Motion for Summary Judgment on May 10, 2011.  ECF No. 48.  The defendant, Nationwide Mutual Fire Insurance Company ("Nationwide"), filed its Motion for Summary Judgment and opposition to Davis's[1] motion on May 23, 2011.  ECF No. 50.  Davis filed his opposition to Nationwide's motion on June

---

[1] Whether the proper possessive form of the plaintiff's name is "Davis's" or "Davis'" is a matter of some debate.  See The Chicago Manual of Style 201 (14th ed. 1993) ("How to form the possessive of polysyllabic personal names ending with the sound of s or z probably occasions more dissension among writers and editors than any other orthographic matter open to disagreement.")  The authorities on this subject appear to be split.  Compare William Strunk, Jr. & E. B. White, The Elements of Style 1 (3d ed. 1979) ("Form the possessive singular of nouns by adding 's.  Follow this rule whatever the final consonant."), with U.S. Gov't Printing Office, GPO Style Manual § 8.3 (30th ed., 2008) ("The possessive case of a singular or plural noun ending in s or with an s sound is formed by adding an apostrophe only."), available at http://www.gpoaccess.gov/stylemanual/index.html.  The Court embraces (perhaps arbitrarily) the former style in this opinion, but reserves the right to revisit this question (perhaps deciding it differently) in future writings.

1, 2011. ECF No. 54. The Court will rule on these motions without oral hearing pursuant to Local Civil Rule 7(J) and Rule 78(b) of the Federal Rules of Civil Procedure.

## I. BACKGROUND

This is an insurance coverage action brought by a pro se plaintiff, seeking payment of flood damage claims pursuant to a Standard Flood Insurance Policy ("SFIP") issued by Nationwide to the plaintiff, Davis, under the auspices of the National Flood Insurance Program ("NFIP"). The NFIP was established by Congress under the National Flood Insurance Act of 1968 to make flood insurance available from the federal government on reasonable terms and conditions and to encourage sound land use by minimizing exposure of property to flood losses. See 42 U.S.C. § 4001. The Director of the Federal Emergency Management Agency ("FEMA") functions as the sole administrator of the NFIP. Battle v. Seibels Bruce Ins. Co., 288 F.3d 596, 599 (4th Cir. 2002). Under FEMA regulations, "all policies issued under the NFIP must be issued using the terms and conditions of the Standard Flood Insurance Policy (SFIP)." Id.

Under these terms, Nationwide operates as an insurance carrier under FEMA's Write-Your-Own (WYO) Program.

> The WYO Program is a program whereby private insurance companies are allowed to issue, under their own names as insurers, flood insurance policies under the Government Program. Insurance companies which participate in the WYO Program are

> known as "WYO Companies." . . . "A WYO Company
> issuing flood insurance coverage shall arrange for
> the adjustment, settlement, payment and defense of
> all claims arising from policies of flood insurance
> it issues under the [NFIP], based upon the terms
> and conditions of the [SFIP]."
>
> Premiums collected by WYO Companies, after
> deducting fees and costs, must be deposited in the
> National Flood Insurance Fund in the United States
> Treasury. . . . In short, premiums collected on
> policies written by WYO Companies do not belong to
> those companies. Thus, claim payments on such
> policies are a direct charge on the United States
> Treasury.

Battle, 288 F.3d at 599-600 (citations omitted).

This Court has subject matter jurisdiction pursuant to 28

U.S.C. § 1331. See Studio Frames Ltd. v. Standard Fire Ins.

Co., 369 F.3d 376, 379-80 (4th Cir. 2004).[2]

## A. DAVIS'S COVERAGE CLAIM

Davis is the owner of a home located at 16 Roberts Landing

Drive in Poquoson, Virginia. The home is an elevated building

situated on a parcel of land adjacent to Roberts Creek. It is

located within an area designated by FEMA as a Special Flood Hazard

Area.[3] In addition to an ordinary homeowner's policy, Davis

---

[2] In Studio Frames, the Fourth Circuit declined to decide
whether the federal courts possess "original and exclusive
jurisdiction" pursuant to 42 U.S.C. § 4072 to "hear and determine"
claims against WYO Companies, as opposed to claims against the
Director of FEMA, finding federal question jurisdiction in such a
case to be sufficient. See Studio Frames, 369 F.3d at 380.

[3] A "Special Flood Hazard Area" is defined in the SFIP as
"[a]n area having special flood or mudflow, and/or flood-related
erosion hazards, and shown on a Flood Hazard Boundary Map or Flood
Insurance Rate Map as Zone A, AO, A1-A30, AE, A99, AH, AR, AR/A,

secured flood insurance from Nationwide, which was issued by Nationwide in its role as a WYO Company, with the policy underwritten by the United States Treasury.

On November 12, 2009, heavy rainfall and a saltwater high tide caused Roberts Creek to overflow and damage low-lying parts of Davis's home. Davis submitted a proof of loss in the amount of $44,941.54 for damage to his property from the flooding. Nationwide requested a report from an independent adjuster, who concluded that Davis was entitled to $18,490.87 under the SFIP and that the remainder of Davis's claim involved damage not covered under the policy. In particular, the adjuster concluded that Davis's home was constructed after the applicable initial Flood Insurance Rate Map ("FIRM") became effective on May 16, 1977; therefore, coverage for flood damage to property located below the lowest elevated floor of Davis's home was limited to certain categories of property specifically enumerated in the policy. On January 7, 2010, Nationwide adopted the adjuster's report and provided Davis with a claim check for $18,490.87 while denying the difference of $26,450.67.[4]

---

AR/AE, AR/AH, AR/AO, AR/A1-A30, V1-V30, VE, or V." 44 C.F.R. pt. 61 app. A(1), art. II(B)(26). Davis's home—indeed his entire community—is situated within an area designated by FEMA as Zone AE.

[4] Nationwide paid $16,874.05 for "building covered damage" and $1,682.74 for "recoverable depreciation" minus a $500.00 deductible. Nationwide also paid $934.08 for "contents covered damages" minus a $500.00 deductible. It appears from the

- 4 -

On July 21, 2010, Davis filed an action against Nationwide in the York County-Poquoson Circuit Court alleging that the damage to his home for which Nationwide had denied coverage was in fact covered under the SFIP.   Nationwide removed that action to this Court on August 17, 2010.  ECF No. 1.  Davis's original complaint was dismissed by the Court with leave to file an amended complaint, which Davis filed on October 19, 2010.  ECF Nos. 9, 11.  Nationwide filed an answer denying Davis's claim that coverage was improperly denied under the terms of the policy, but moved to dismiss four additional claims that Nationwide argued were preempted by federal law.   ECF Nos. 12, 15.  The Court granted Nationwide's motion to dismiss on April 14, 2011, leaving only Davis's coverage claim to be resolved.  ECF No. 44.

## B. THE STANDARD FLOOD INSURANCE POLICY

The specific terms of the SFIP Dwelling Form issued to Davis were established by regulations promulgated by FEMA, found at Appendix A(1) to Part 61 of Title 44 of the Code of Federal

---

adjuster's report that Nationwide paid for the cost to clean up mud and debris and repair certain damage caused by the flooding. Nationwide denied coverage for damage to "the garage doors, rear entry door, drywall, moisture barrier, termite treatment, tackle box, gas can, welder, etc. located below the first elevated floor in your Post-firm [sic] elevated building."   Davis claims that Nationwide also improperly refused coverage for flood damage to certain foundation vents and to miscellaneous personal property stored in the garage.

Regulations.[5]

The declarations page of the SFIP issued to Davis identifies his home as an elevated building of post-FIRM construction. ECF No. 8 attach. 6. The SFIP defines an "Elevated Building" as "[a] building that has no basement and that has its lowest elevated floor raised above ground level by foundation walls, shear walls, posts, piers, pilings, or columns." 44 C.F.R. pt. 61 app. A(1), art. II(B)(14). It defines a "Post-FIRM Building" as "[a] building for which construction or substantial improvement occurred after December 31, 1974, or on or after the effective date of an initial Flood Insurance Rate Map (FIRM), whichever is later." Id. art. II(B)(23).

Under Coverage A of the SFIP, Nationwide agreed, on behalf of FEMA, to insure certain "building property" against flood damage. Specifically, Nationwide agreed to:

> insure against direct physical loss by or from flood[6] to:

---

[5] A copy of the "Dwelling Policy" provided to Davis was attached as an exhibit to Davis's brief in opposition to an Nationwide's earlier motion to dismiss. ECF No. 8 attach. 1. This policy document provides on its first page that it was issued pursuant to the National Flood Insurance Act of 1968 and applicable federal regulations in Title 44 of the Code of Federal Regulations. Appendix A(1) to Part 61 of Title 44 sets forth the terms of the "Dwelling Form" of the SFIP, which matches the terms of the "Dwelling Policy" issued to Davis by Nationwide as a WYO Company, as required by federal regulations. See 44 C.F.R. pt. 62 app. A, art. II(D)(3); see also 44 C.F.R. § 61.13(f).

[6] The SFIP defines the phrase "Direct Physical Loss By or From Flood" as: "Loss or damage to insured property, directly caused by

- 6 -

> 1. The dwelling at the described location . . . .
>
> 2. Additions and extensions attached to and in contact with the dwelling by means of a rigid exterior wall, a solid load-bearing interior wall, a stairway, an elevated walkway, or a roof. . . . Additions and extensions attached to and in contact with the building by means of a common interior wall that is not a solid load-bearing wall are always considered part of the dwelling . . . .

Id. art. III(A)(1),(2).

Under Article III(A)(8), the SFIP provides limited coverage to certain building property located below the lowest elevated floor of an elevated post-FIRM building situated in a Special Flood Hazard Area. Specifically, Nationwide agreed to:

> insure against direct physical loss by or from flood to . . . [i]tems of [building] property in a building enclosure below the lowest elevated floor of an elevated post-FIRM building located in [a Special Flood Hazard Area], or in a basement, regardless of the zone. Coverage is limited to the following:
>
> a. Any of the following items, if installed in their functioning locations and, if necessary for operation, connected to a power source:
>
> (1) Central air conditioners;
>
> (2) Cisterns and the water in them;
>
> (3) Drywall for walls and ceilings in a basement and the cost of labor to nail it, unfinished and unfloated and not taped, to the framing;
>
> (4) Electrical junction and circuit breaker boxes;
>
> (5) Electrical outlets and switches;

---

a flood.  There must be evidence of physical changes to the property."  44 C.F.R. pt. 61, app. A(1), art. II(B)(12).

(6) Elevators, dumbwaiters and related equipment, except for related equipment installed below the base flood elevation after September 30, 1987;

(7) Fuel tanks and the fuel in them;

(8) Furnaces and hot water heaters;

(9) Heat pumps;

(10) Nonflammable insulation in a basement;

(11) Pumps and tanks used in solar energy systems;

(12) Stairways and staircases attached to the building, not separated from it by elevated walkways;

(13) Sump pumps;

(14) Water softeners and the chemicals in them, water filters, and faucets installed as an integral part of the plumbing system;

(15) Well water tanks and pumps;

(16) Required utility connections for any item in this list; and

(17) Footings, foundations, posts, pilings, piers, or other foundation walls and anchorage systems required to support a building.

b. Clean-up.

44 C.F.R. pt. 61 app. A(1), art. III(A)(8).

Under Coverage B, the SFIP provides similar coverage, subject to a separate deductible and limit of liability, for personal property located inside an insured building. See 44 C.F.R. pt. 61 app. A(1), art. III(B)(1). Under Article III(B)(3), the SFIP provides limited coverage to certain personal property located below the lowest elevated floor of an elevated post-FIRM building

- 8 -

situated in a Special Flood Hazard Area.    Specifically, the SFIP

provides that:

> Coverage for items of [personal] property in a building enclosure below the lowest elevated floor of an elevated post-FIRM building located in [a Special Flood Hazard Area], or in a basement, regardless of the zone, is limited to the following items, if installed in their functioning locations and, if necessary for operation, connected to a power source:
>
> a. Air conditioning units, portable or window type;
>
> b. Clothes washers and dryers; and
>
> c. Food freezers, other than walk-in, and food in any freezer.

44 C.F.R. pt. 61 app. A(1), art. III(B)(3).

## II.  SUMMARY JUDGMENT STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, summary

judgment should be granted only if "there is no genuine dispute as

to any material fact and the movant is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(a).  A fact is "material" only

if it might affect the outcome of the case.  Anderson v. Liberty

Lobby, 477 U.S. 242, 248 (1986).  A dispute of material fact is

"genuine" only if the evidence "is such that a reasonable jury

could return a verdict for the non-moving party."  Id.  In deciding

a summary judgment motion, the Court must view the record as a

whole and in the light most favorable to the nonmovant.  Terry's

Floor Fashions, Inc. v. Burlington Indus., Inc., 763 F.2d 604, 610

(4th Cir. 1985).

The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion," and demonstrating the absence of a genuine dispute of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the movant makes such a showing, the nonmovant must set forth specific facts, supported by the record, demonstrating that "the evidence presents a sufficient disagreement to require submission to the jury." Anderson, 477 U.S. at 251-52.

When confronted with cross-motions for summary judgment, "the standards upon which the court evaluates the motions for summary judgment do not change." Taft Broad. Co. v. United States, 929 F.2d 240, 248 (6th Cir. 1991). "[T]he Court must review each motion separately on its own merits 'to determine whether either of the parties deserves judgment as a matter of law.'" Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th Cir. 2003) (quoting Philip Morris Inc. v. Harshbarger, 122 F.3d 58, 62 n.4 (1st Cir. 1977)). The mere fact that both sides have moved for summary judgment does not establish that no genuine dispute of material fact exists, thus requiring that judgment be granted to one side or the other. See Worldwide Rights Ltd. P'ship v. Combe Inc., 955 F.2d 242, 244 (4th Cir. 1992); Am. Fid. & Cas. Co. v. London & Edinburgh Ins. Co., 354 F.2d 214, 216 (4th Cir. 1965). Even if the basic facts are not in dispute, the parties may nevertheless disagree as to the inferences that reasonably may be drawn from them, in which case summary

judgment may be inappropriate, necessitating the denial of both motions.  See Am. Fid. & Cas. Co., 354 F.2d at 216.

### III. ANALYSIS

#### A. SUBSTANTIVE LAW GOVERNING INTERPRETATION OF THE SFIP

"Federal common law controls the interpretation of insurance policies issued pursuant to the National Flood Insurance Program." Leland v. Fed. Ins. Adm'r, 934 F.2d 524, 529 (4th Cir. 1991). Federal common law, however, draws upon standard insurance law principles to resolve disputes over coverage pursuant to a SFIP.[7]

---

[7] The Court notes that the terms of the SFIP have been promulgated by FEMA regulation.  See generally 44 C.F.R. § 61.13; id. pt. 61, app. A(1) (SFIP Dwelling Form).  Ordinarily, FEMA's interpretation of its own regulations is entitled to substantial deference by the federal courts.  See United States v. Hoechst Celanese Corp., 128 F.3d 216, 221 (4th Cir. 1997); see also Stinson v. United States, 508 U.S. 36, 45 (1993) ("Provided an agency's interpretation of its own regulations does not violate the Constitution or a federal statute, it must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation.").  Although the terms of the SFIP are promulgated by the United States in its role as a regulator, the individual policy issued to Davis by Nationwide (as a servicing agent for FEMA under the auspices of the WYO Program) is an insurance contract entered into by the United States in a non-regulatory role.  As the Supreme Court has observed, "[w]hen the United States enters into contract relations, its rights and duties therein are governed generally by the law applicable to contracts between private individuals." United States v. Winstar Corp., 518 U.S. 839, 895 (1996) (quoting Lynch v. United States, 292 U.S. 571, 579 (1934)); see also Cooke v. United States, 91 U.S. 389, 398 (1875) ("If [the federal government] comes down from its position of sovereignty, and enters the domain of commerce, it submits itself to the same laws that govern individuals there."); In re Peanut Crop Ins. Litig., 524 F.3d 458, 470 (4th Cir. 2008) ("[I]t is customary, where Congress has not adopted a different standard, to apply to the construction of government contracts the principles of general contract law,

Studio Frames Ltd. v. Standard Fire Ins. Co., 483 F.3d 239, 245 (4th Cir. 2007).  First, "if the policy language in issue is clear and unambiguous, we apply it directly.  Second, if the disputed language is ambiguous, or susceptible to different constructions, we adopt the construction most favorable to the insured."  Id. Third, this "rule favoring the insured where ambiguity exists 'should not be applied automatically,'" because "'[i]nsurance contracts are to be reasonably construed consonant with the apparent objective and intent of the parties.'"  Hanover Bldg. Materials, Inc. v. Guiffrida, 748 F.2d 1011, 1013 (5th Cir. 1984) (quoting Eagle Leasing Corp. v. Hartford Fire Ins. Co., 540 F.2d 1257, 1262 (5th Cir. 1976)), cited with approval in Studio Frames, 483 F.3d at 245.  Fourth, "'[i]n deciding what a reasonable construction of the contested provisions is, the material we may draw from consists of those [contested] provisions, the policy as a whole, and the apparent objectives of the parties in establishing this kind of contractual relationship.'"  Id. (quoting Eagle

---

which become federal common law.") (quoting Long Island Sav. Bank, FSB v. United States, 503 F.3d 1234, 1245 (Fed. Cir. 2007)).

Accordingly, this Court looks to standard insurance law principles and treats FEMA guidance with respect to specific provisions of the SFIP as evidence of the objectives and intent of one of the parties to an insurance contract, rather than treating FEMA guidance as regulatory interpretations entitled to controlling weight.  See, e.g., Studio Frames, 483 F.3d at 244-48.  But see Ginart v. State Farm Cas. Ins. Co., No. 07-6841, 2009 WL 537092, at *4 (E.D. La. Mar. 4, 2009) (giving controlling weight to FEMA guidance interpreting certain SFIP provisions) (quoting Stinson, 508 U.S. at 36-37).

Leasing, 540 F.2d at 1262). And finally, "'if the meaning of the policy terms remains [in the end] unclear, the policy is generally construed in favor of the insured in order to promote the policy's objective of providing coverage.'" Id. (quoting Eagle-Pitcher Indus., Inc. v. Liberty Mut. Ins. Co., 682 F.2d 12, 17 (1st Cir. 1982)) (alteration in original).

## B. WHETHER DAVIS'S HOME IS A POST-FIRM BUILDING

In denying coverage for a portion of the losses claimed by Davis, Nationwide relied on policy language limiting coverage for flood losses to property located below the lowest elevated floor of an elevated post-FIRM building situated in a Special Flood Hazard Area. See 44 C.F.R. pt. 61 app. A(1), arts. III(A)(8), III(B)(3). The effective date of the initial FIRM for the community where Davis's property is located is May 16, 1977. See ECF No. 51 attach. 3 (extract from legend of applicable FIRM). A threshold issue then is whether construction of Davis's home at 16 Roberts Landing Drive was started on or after May 16, 1977.[8]

---

[8] As noted above, the SFIP defines "Post-FIRM Building" as "[a] building for which construction or substantial improvement occurred after . . . the effective date of an initial Flood Insurance Rate Map (FIRM) . . . ." 44 C.F.R. pt. 61 app. A(1), art. II(B)(23). FEMA has further clarified that "Post-FIRM buildings are buildings for which the start of construction occurred on or after the effective date of the initial Flood Insurance Rate Map (FIRM) for the community in which the building is located." Elevated Building Coverage, 53 Fed. Reg. 27,989, 27,989 (July 26, 1988) (to be codified at 44 C.F.R. pt. 61); see also Fed. Emergency Mgmt. Agency, National Flood Insurance Program: Adjuster Claims Manual at V-11 (rev. 2010) (clarifying that a

Both parties move for summary judgment on this issue. Nationwide, relying on public land records, contends that Davis's home was built in 1978, and that construction certainly began no earlier than August 4, 1977, the date when the subdivision plat map for Davis's community was approved. Davis, relying on statements by a deceased insurance agent and an unidentified real estate agent, contends that his home was built in 1974 or 1975.

In evaluating each party's motion for summary judgment, the Court must first determine if the moving party has made a prima facie showing that it is entitled to summary judgment. See Fed. R. Civ. P. 56(a); Celotex, 477 U.S. at 331. Once that prima facie showing has been made, the burden shifts to the nonmoving party to demonstrate the existence of a genuine dispute of material fact. See Fed. R. Civ. P. 56(a); Celotex, 477 U.S. at 331.

Both the moving and nonmoving party may cite to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set

---

"Post-FIRM Building" is one with a "[s]tart of construction . . . after the publication of the initial Flood Insurance Rate Map (FIRM)"), available at http://www.fema.gov/library/viewRecord.do?id=1584.

out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

> Generally speaking, evidence must be admissible at trial in order to be considered on summary judgment. A significant exception is affidavits; under Fed. R. Civ. P. 56(e), affidavits, although not themselves admissible at trial, may be offered in support of, or opposition to, summary judgment if they set forth facts that would be admissible under the Federal Rules of Evidence.

Sook Yoon v. Sebelius, No. CBD-08-3173, 2010 WL 4293513, at *5 (D. Md. Nov. 1, 2010) (citations omitted); see also Ziskie v. Mineta, 547 F.3d 220, 225 (4th Cir. 2008) (holding that principles found in the Federal Rules of Evidence apply to summary judgment motions).

### 1. Davis's Motion for Summary Judgment

Davis contends that he is entitled to summary judgment because his home was built before the May 16, 1977 FIRM effective date, and therefore it is not subject to the coverage limitations imposed by Articles III(A)(8) and III(B)(3). In support, Davis submits the declarations page of a homeowner's policy issued to him by Nationwide in 2002, which states, in conclusory fashion, that his home was built in 1974. ECF No. 49 attach. 1. He further states in his supporting memorandum that the (unidentified) real estate agent who sold him his home in 1979 told him that it was built in 1975. Pl.'s Mem. in Supp. of Mot. for Summ. J. 6-7, ECF No. 49. But Davis also submits copies of his flood insurance application

and certain city land records, all of which state that his home was built in 1978. ECF No. 49 attachs. 4-6. In his supporting memorandum, Davis concedes that there is conflicting information regarding the construction date of his home, some of it suggesting that his home is a post-FIRM building. See Pl.'s Mem. in Supp. of Mot. for Summ. J. 7-8, ECF No. 49. On this record, Davis has clearly failed to make a prima facie showing that there is no genuine dispute of material fact and that he is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(a); Celotex, 477 U.S. at 331. Accordingly, the Court will deny the plaintiff's motion for summary judgment to the extent Davis seeks a ruling that his home was built before the applicable FIRM effective date.

## 2. Nationwide's Motion for Summary Judgment

In support of its position that Davis's home was constructed after May 16, 1977, Nationwide has submitted land records obtained from an online database maintained by the City of Poquoson.[9] ECF

---

[9] The Court notes that government records such as these, obtained from the website of the City of Poquoson Assessor's Office, are typically self-authenticating and not excluded by the hearsay rule, and they are therefore admissible evidence of the information contained therein. See Fed. R. Evid. 902(5) (self-authentication of official publications); Fed. R. Evid. 803(8) (hearsay exception for public records and reports); see also Paralyzed Veterans of Am. v. McPherson, No. C 06-4670, 2008 WL 4183981, at *6-*7 (N.D. Cal. Sept. 9, 2008). Moreover, the information contained in such government records is generally admissible by judicial notice. See Fed. R. Evid. 201(b) ("A judicially noticed fact must be one not subject to reasonable dispute in that it is . . . capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably

No. 51 attach. 7.  These land records identify 1978 as the "Year
Built" for Davis's home.[10]  From its own files, Nationwide has also
submitted: (1) a copy of the flood insurance application submitted
for Davis's property, which indicates a "Constr[uction] Date/Permit
Date" of April 15, 1978, ECF No. 51 attach. 8; (2) a copy of
correspondence, dated November 11, 2005, forwarding the same
application form to Davis's insurance agent for his review, ECF No.
51 attach. 9; and (3) a copy of the declarations page of the flood
insurance policy issued to Davis, which describes the home as
"Post-Firm Construction," ECF No. 51 attach. 10.[11]

---

be questioned."); see also Scott v. Hollister, No. 1:10-2517, 2011
WL 825746, at *1 & n.1 (D.S.C. Feb. 7, 2011); Scott v. Stansbury,
No. 2:10cv61, 2010 WL 5769521, at *2 n.4 (E.D. Va. Dec. 16, 2010).
    [10] Davis attempts to impeach the accuracy of this information
by pointing to other information in the city land records that is
allegedly incorrect.  For example, Davis claims that, whereas the
land records describe his home as having three bedrooms, two
bathrooms, and wood siding, his home actually has four bedrooms,
two-and-a-half bathrooms, and vinyl siding.  Pl.'s Mem. in Supp. of
Mot. for Summ. J. 6, ECF No. 49.  As Nationwide points out, Davis
has submitted this information only in his unsworn memorandum,
rather than by affidavit, declaration, or citation to documentary
evidence in the record.  Moreover, the Court notes that the
features highlighted by Davis are all physical characteristics
subject to modification by a homeowner over time.  By contrast, the
construction date of his home is an immutable characteristic of the
property, and the city's land records are competent evidence of
this historical fact.
    [11] These additional documents are authenticated by the
declaration of a corporate representative of Nationwide who is also
the custodian of records for Davis's claim file there.    The
declarant also states that these documents are true and correct
copies of documents maintained by Nationwide for Davis's insurance
claim under the SFIP issued by Nationwide.  The Court notes that
these two documents are therefore admissible as regularly kept
business records, pursuant to the hearsay exception set out in Rule

Nationwide further relies on a stipulation that the City of Poquoson granted an Approval of Plat for the Roberts Landing subdivision, where Davis's home is located, on August 4, 1977. See Final Pre-Trial Order para. 1(A)(1) (stipulation of undisputed fact), ECF No. 45; see also ECF No. 51 attach. 11 (Roberts Landing subdivision plat, approved and recorded August 4, 1977). Nationwide submits additional documents to demonstrate that a city ordinance in effect at the time provided that the City of Poquoson would not issue a building permit for the construction of any building within a subdivision until a subdivision plat had first been approved by the City Manager. ECF No. 51, attachs. 12, 13.[12] These documents suggest that the earliest possible date upon which construction of Davis's home could have begun was August 4, 1977, the date when the subdivision plat for his community was approved

803(6) of the Federal Rules of Evidence. See Nader v. Blair, 549 F.3d 953, 963 (4th Cir. 2008) (business records admissible under Fed. R. Evid. 803(6) constituted "appropriate summary judgment evidence").

[12] Although this historical city ordinance is not available on the internet, the document submitted is nevertheless self-authenticating and not excluded by the hearsay rule, and it is therefore admissible evidence of the provisions of the ordinance itself. See Fed. R. Evid. 902(5) (self-authentication of official publications); Fed. R. Evid. 803(8) (hearsay exception for public records and reports). Moreover, the specific provisions of the subdivision ordinance itself are admissible by judicial notice. See Fed. R. Evid. 201(b). The Court further notes that the contemporary version of the Subdivision Ordinance of the City of Poquoson, Virginia, which is readily accessible online, is substantively identical to the 1976 subdivision ordinance in all material respects. See Poquoson, Virginia, Ordinance No. 461, §§ 3-1, 4-2, 4-4 (1981), available at http://library.municode.com/html/11443/level2/PTIICOOR_APXBSU.html.

and recorded, and thus the first date when a building permit could have been issued.

Nationwide has cited a substantial body of documentary evidence to establish that Davis's home was constructed at some time after May 16, 1977, the effective date of the initial FIRM for the area where Davis's property is located. Accordingly, Nationwide has met its initial burden of making a prima facie showing that it is entitled to summary judgment on this issue. The burden thus shifts to Davis to demonstrate the existence of a genuine dispute of material fact.

In response to Nationwide's evidence, Davis relies on: (1) the declarations page of a separate homeowner's policy issued to him by Nationwide in 2002, which states, in conclusory fashion, that his home was built in 1974, ECF No. 49, attach. 1; (2) a statement that the home was built in 1975, made to Davis by an unidentified real estate agent when he sold the home to Davis in 1979, Pl.'s Mem. in Supp. of Mot. for Summ. J. 6-7, ECF No. 49; and (3) a document related to a flood claim filed by his neighbor, which indicates a pre-FIRM construction date for his neighbor's home, ECF No. 49, attach. 7. None of these documents constitutes admissible evidence upon which Davis may rely to establish a genuine dispute of material fact.

First, Davis submits the declarations page of a homeowner's policy issued to him by Nationwide in 2002, which contains a

conclusory statement that his home was built in 1974, rather than 1978. Bill Ward, the insurance agent who prepared and presented the homeowner's policy to Davis, is reportedly deceased and therefore unavailable to offer testimony at trial. Davis instead seeks to rely on the declarations page itself to establish a pre-FIRM construction date for his home. But this document constitutes inadmissible hearsay which cannot be relied upon to demonstrate the existence of a material dispute as to the construction date of Davis's home. See Fed. R. Evid. 802; see also Ziskie, 547 F.3d at 225. Moreover, none of the established exceptions to the hearsay rule appear to apply. See Fed. R. Evid. 803, 804.[13]

Second, Davis suggests, in his supporting memorandum, that he was told by an unidentified real estate agent in 1979 that his home

---

[13] Although Davis does not raise this argument, the Court notes that the alleged construction date set out in this particular document also is not admissible as an admission by party-opponent pursuant to Rule 801(d)(2) of the Federal Rules of Evidence. This is due to the fact that the document contains double hearsay, or hearsay within hearsay. Davis describes Ward as a "Nationwide insurance agent" and Nationwide does not contradict this characterization. But even assuming that Ward was an agent for Nationwide capable of making a statement which would be admissible as a party-opponent admission, the statement itself is based on hearsay. There is nothing to suggest that Ward had personal knowledge with respect to the construction date of Davis's home, and Davis admits that he does not know where Ward obtained this information. Therefore, this secondary level of hearsay cannot be attributed to Nationwide, and the document is inadmissible. Vazquez v. Lopez-Rosario, 134 F.3d 28, 34 (1st Cir. 1998) ("[U]natributed statements repeated by party-opponents cannot be admissible. As the original declarant is unknown, it is impossible to determine whether the original declarant also fits within the party-opponent definition.").

had been built in 1975. But absent an affidavit or declaration by the real estate agent, made on personal knowledge, this statement as relayed by Davis himself is inadmissible hearsay, to which none of the established exceptions to the hearsay rule appear to apply. See Fed. R. Evid. 802, 803, 804.

Third, Davis submits a document related to a flood claim filed by his neighbor, which indicates a pre-FIRM construction date for his neighbor's home. ECF No. 49 attach. 7. Davis states in his own affidavit that this document is "accurate," but fails to provide any information to establish his personal knowledge with respect to the authenticity of this document, which pertains to a home other than his own. See ECF No. 55. Moreover, much the same as the declarations page addressed above, this unattributed statement regarding the construction date of a neighboring home is inadmissible hearsay, subject to none of the established exceptions to the hearsay rule. See Fed. R. Evid. 802, 803, 804; Vazquez, 134 F.3d at 34. Finally, the construction date of a neighboring home simply is not relevant to the question of whether the plaintiff's home was built before or after the May 16, 1977 FIRM effective date.[14]

---

[14] In any event, the Court notes that land records pertaining to the neighbor's home, copies of which were submitted by the plaintiff himself, identify the neighboring home as having been built in 1978 as well. ECF No. 49 attach. 8-9. To the extent that Nationwide has misclassified the neighboring home as a pre-FIRM building and paid flood damage claims submitted by the plaintiff's

Ultimately, the only admissible evidence submitted on this point establishes that Davis's home was constructed at some date after the applicable FIRM effective date of May 16, 1977. Davis has failed to cite any admissible evidence to demonstrate a material dispute of fact that would require the submission of this issue to a finder of fact at trial.[15] See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). Accordingly, the Court FINDS that there is no genuine dispute of material fact with respect to the post-FIRM construction of Davis's home, and that Nationwide is entitled to judgment as a matter of law on this issue. Specifically, the Court FINDS that Articles III(A)(8) and III(B)(3), which limit coverage with respect to property located below the lowest elevated floor of an elevated post-FIRM building, apply to limit coverage with respect to the flood losses claimed by Davis.

### C. DAVIS'S REMAINING CLAIMS FOR COVERAGE

Davis concedes that if his home is indeed a post-FIRM

neighbor without asserting the same post-FIRM coverage limitations as it did with respect to Davis's claim, this suggests only that Davis's neighbor may have benefited from a windfall due to Nationwide's misclassification of that property as pre-FIRM. It does not in any way support the plaintiff's claim that his home should be similarly classified as pre-FIRM.

[15] The Court notes that, even if the documents submitted by Davis were admissible, summary judgment for Nationwide on this point would be appropriate nonetheless, as the information cited by Davis is at best "a mere scintilla of evidence that is not significantly probative and would not allow a reasonable fact-finder to return a verdict in [his] favor." See Textron Inc. v. Barber-Coleman Co., 903 F. Supp. 1546, 1558 (W.D.N.C. 1995).

building, coverage for some portion of his claimed losses was properly denied by Nationwide. But Davis contends that he nevertheless is entitled to coverage for $16,253.00 in losses that were improperly denied by Nationwide. In particular, Davis argues that certain of the items of property classified by Nationwide as located below the lowest elevated floor of Davis's home, and therefore not covered pursuant to Articles III(A)(8) and III(B)(3), should be covered because some undamaged portion of each of these items extends above the lowest elevated floor. Davis further argues that certain additional items of property fall within the scope of the limited coverage afforded to items of property specified in Article III(A)(8).

### 1. **Items Both Above and Below the Lowest Elevated Floor**

Davis contends that Nationwide improperly denied coverage with respect to several items of property—two insulated steel overhead garage doors, an insulated steel back entry door to the garage, sheets of drywall affixed to wall studs in the garage, and various tools and equipment sitting on the floor of the garage[16]—which Davis contends lie both above and below the lowest elevated floor of his home. Davis concedes that the flood waters, and the resultant flood damage, did not rise to the level of the lowest elevated floor of his home, but he argues that, because some

---

[16] Davis provides a detailed list of these personal property items in his memorandum in support. See Pl.'s Mem. in Supp. of Mot. for Summ. J. 4-5, ECF No. 49.

undamaged portion of each of these items extends above the lowest elevated floor, coverage should be afforded with respect to the entire item, including the damaged portion located below the lowest elevated floor.

Generally, the SFIP provides coverage for "direct physical loss by or from flood to . . . [t]he dwelling at the described location . . . [and] [a]dditions and extensions attached to and in contact with the dwelling by means of a rigid exterior wall, a solid load-bearing interior wall, a stairway, an elevated walkway, or a roof."[17]  44 C.F.R. pt. 61 app. A(1), arts. III(A)(1)-(2).  The policy provides limited coverage for flood losses to certain specifically identified items of "building property"[18] and "personal property"[19] below the lowest elevated floor of an elevated post-FIRM building.  See id. arts. III(A)(8), III(B)(3).

---

[17] Based on the documentary evidence submitted by the parties, it appears that Davis's attached garage is an "addition [or] extension" to the dwelling, covered under Article III(A)(2) of the SFIP.  See ECF No. 8 attach. 2, at 6.  If the attached garage is not correctly considered an "addition [or] extension," however, it nevertheless would be considered an intrinsic part of the dwelling itself, subject to coverage under Article III(A)(1).  See 44 C.F.R. pt. 61 app. A(1), art. III(A)(2).  Davis's attached garage is covered under Coverage A in any event, so this distinction is not material to the current dispute.
[18] For example, coverage is provided for central air conditioners, electrical outlets and switches, heat pumps, and certain other fixtures attached to real property, provided they are installed in their functioning locations.
[19] For example, coverage is provided for window air conditioning units, clothes washers and dryers, and certain other moveable items of property, provided they are installed in their functioning locations.

Pursuant to Articles III(A)(8) and III(B)(3) of the SFIP, Nationwide denied Davis's coverage claim for flood losses to the overhead garage doors, the back entry door to the garage, drywall in the garage, and various tools and equipment sitting on the garage floor.  ECF No. 51 attach. 6.  In doing so, Nationwide relied on two reports by an independent adjuster, who observed that flood waters reached a depth of approximately two feet, damaging the lower portion of the garage walls and doors, as well as a number of tools and supplies sitting on the garage floor and submerged in flood waters.  ECF No. 51 attachs. 4 & 5.  The flood waters did not rise to the level of the lowest elevated floor of the home.  Id.

Davis does not contend that the flood waters rose above the level of the lowest elevated floor, but rather, he contends that each of these items of property was not "below the lowest elevated floor" as set forth in Articles III(A)(8) and III(B)(3) of the SFIP because some portion of each item extends above the lowest elevated floor as well.  Because the flood damage required the replacement of undamaged portions of these items of property extending above the lowest elevated floor, he argues that each item should be considered "above" the lowest elevated floor rather than below it, and thus coverage should respond for each of these items of property in its entirety.

While creative, Davis's construction of the language of

- 25 -

Articles III(A)(8) and III(B)(3) is not a reasonable one, and it is contrary to the plain meaning of these provisions.  With respect to the overhead garage doors, the back entry door to the garage, and damaged drywall in the garage, Nationwide agreed to "insure against direct physical loss by or from flood to . . . [i]tems of [building] property in a building enclosure below the lowest elevated floor of an elevated post-FIRM building," subject to the caveat that this "[c]overage is limited to" certain enumerated types of building property.  44 C.F.R. pt. 61, app. A(1) art. III(A)(8).  With respect to the tools and equipment sitting on the garage floor, Nationwide agreed to "insure against direct physical loss by or from flood to personal property," subject to the caveat that "[c]overage for items of [personal] property in a building enclosure below the lowest elevated floor of an elevated post-FIRM building . . . is limited to" certain enumerated types of personal property.  Id. arts. III(B)(1)&(3).  "Direct Physical Loss by or from Flood" is defined in the SFIP as "[l]oss or damage to insured property, directly caused by a flood.  There must be evidence of physical changes to the property."  Id. art. II(B)(12) (emphasis added).

The Court finds this language to be clear and unambiguous.  Considering the words of these provisions in their plain and ordinary sense, the Court concludes that the SFIP affords full coverage only for direct physical damage to property located at or

above the lowest elevated floor of an elevated post-FIRM building, and limited coverage (i.e., coverage only for the listed items) with respect to direct physical damage to property below the lowest elevated floor of an elevated post-FIRM building.  See Thomas v. Standard Fire Ins. Co., 414 F. Supp. 2d 567, 571 (E.D. Va. 2006) ("[W]here the language and meaning [of a policy] is clear and unambiguous it is to be understood in its plain, ordinary and popular sense.").   Concomitantly, the SFIP does not provide coverage for indirect losses to insured property at or above the lowest elevated floor caused by flood damage to uninsured property below the elevated floor.  See id.

As Davis concedes, the portions of each of these items of property directly damaged by flood are located below the lowest elevated floor of his home.  The portions of the overhead garage doors, the garage entry door, the garage drywall, and the tools and equipment stored on the garage floor that extend above the lowest elevated floor were only indirectly damaged by flood insofar as the damage to the uninsured lower portion of each item required replacement of the entire item.  Davis concedes that there has been no direct physical damage to the insured, upper portions of the overhead garage doors, the back entry door to the garage, the drywall in the garage, or the tools and equipment sitting on the garage floor, situated above the lowest elevated floor of his home; physical damage from flood waters was limited to uninsured portions

- 27 -

of the property located below the lowest elevated floor. Applying the clear and unambiguous policy language contained in Articles II(B)(12), III(A)(8), and III(B)(3) directly, it is evident that Nationwide's denial of coverage for each of these items was entirely appropriate.[20]

---

[20] The Court further notes that this reading of the policy language is entirely consistent with FEMA's own publicly available guidance with respect to these coverage provisions:

> Full coverage for post-FIRM elevated buildings begins at the lowest elevated floor. This is the lowest floor raised above the ground . . . .
>
> . . . The coverage restrictions [of Articles III(A)(8) and III(B)(3)] apply to any area of an elevated building that is lower than the lowest elevated floor. Coverage will respond for the building and personal property items listed in the policy [at Articles III(A)(8) and III(B)(3)], provided that these items are connected to a power source [if necessary] and installed in their functioning locations . . . .
>
> . . . .
>
> If a post-FIRM elevated building located in [a Special Flood Hazard Area] has an attached garage with a floor lower than the lowest elevated floor, the coverage restrictions apply to that area. Any contents located above the level of the lowest elevated floor (such as hanging from the ceiling or on the garage walls) are covered.

Fed. Emergency Mgmt. Agency, National Flood Insurance Program: Adjuster Claims Manual at VIII-6 (rev. 2010), available at http://www.fema.gov/library/viewRecord.do?id=1584; see also Elevated Building Coverage, 53 Fed. Reg. 27,989, 27,989 (July 26, 1988) (to be codified at 44 C.F.R. pt. 61) ("The [post-FIRM elevated building] coverage limitation exclude[s] flood insurance coverage under the SFIP for the contents in enclosed areas below the elevated floors of such buildings, and the enclosed areas

Accordingly, the Court FINDS that there is no genuine dispute of material fact with respect to the fact that any direct physical losses to the overhead garage doors, the back entry door to the garage, the drywall in the garage, and the various tools and equipment sitting on the garage floor was limited to portions of these items of property located below the lowest elevated floor of Davis's home, and that the losses claimed with respect to insured property located above the lowest elevated floor of Davis's home were only indirectly caused by flood. The Court further FINDS that Nationwide is entitled to judgment as a matter of law on this issue, as coverage for flood losses to property located below the lowest elevated floor of an elevated post-FIRM building is limited to certain enumerated items specified in Articles III(A)(8) and

themselves, retaining coverage only for essential foundation and other elements in such enclosed areas.").

It is also consistent with the stated purpose of the National Flood Insurance Program to "guide the development of proposed future construction, where practicable, away from locations which are threatened by flood hazards." See 42 U.S.C. § 4001(c)(2); see also Coverage, Sales and Eligibility Provisions, 48 Fed Reg. 39,066, 39,067 (Aug. 29, 1983) (to be codified at 44 C.F.R. pts. 59 & 61) ("FEMA is convinced that the financial exposure does not warrant continuation of coverage for . . . enclosures (and contents) beneath the first floor of elevated structures."); cf. Insurance Coverage and Rates, 65 Fed. Reg. 60,758, 60,761 (Oct. 12, 2000) (to be codified at 44 C.F.R. pts. 59 & 61) (noting that offering coverage for additional types of property in basements "might be at odds with the NFIP's floodplain management efforts: The NFIP would on the one hand be trying to guide development and occupancy away from the riskier flood-prone areas while inviting such uses with its coverage.").

III(B)(3) of the SFIP, none of which applies to these items.[21]

## 2. Termite Treatment

Davis contends that Nationwide improperly denied his claim for coverage with respect to post-flood termite treatments.  He argues

---

[21] The Court notes that, in passing, Davis states that "the drywall and studs are part of the system to support a building," Pl.'s Mem. in Supp. of Mot. for Summ. J. 4, ECF No. 49, apparently suggesting that the damaged drywall in the garage should be covered as an enumerated item specified in Article III(A)(8), which provides that coverage will be afforded for "direct physical loss by or from flood to . . . [f]ootings, foundations, posts, pilings, piers, or other foundation walls and anchorage systems required to support a building."  44 C.F.R. pt. 61 app. (A)(1), art. III(A)(8)(a)(17).  The Court further notes that drywall or gypsum wallboard is typically used for the finish construction of interior walls and ceilings, with sheets of drywall fastened to or hung from wall or ceiling studs.  See generally Drywall Tapers & Pointers of Greater New York, Local 1974 v. Local 530 of the Operative Plasterers' & Cement Masons' Int'l Ass'n, Nos. 93-CV-0154 & 98-CV-7076, 2005 WL 638006, at *2 (E.D.N.Y. Mar. 17, 2005) ("Taping is the traditional process for finishing interior walls constructed with gypsum wallboard, which is also referred to as 'drywall' and as 'sheetrock.'  Drywall is the material used for most interior walls in modern construction."); U.S. Gypsum Co. v. Nat'l Gypsum Co., 387 F.2d 799, 800 (7th Cir. 1967) ("Drywall construction is presently used in over 70 percent of residential construction. Large sheets of wallboard are nailed to studding to form interior walls."); Dictionary of Architecture & Construction 485 (Cyril M. Harris ed., 4th ed. 2006) (noting that gypsum wallboard is "used primarily as an interior surfacing in a building"); 1 Cal. Ins. Law Dictionary & Desk Reference § D78:1 (2011) ("Drywall is a common manufactured building material used globally for the finish construction of interior walls and ceilings. . . .  Drywall is commonly known as gypsum board, wallboard, [or] plaster board."). Davis provides no support whatsoever for his suggestion that the damaged drywall in his garage somehow constitutes an "anchorage system[] required to support a building."  In any event, this conclusory statement is insufficient to support or defeat summary judgment.  See Erwin v. United States, 591 F.3d 313, 319 (4th Cir. 2010); Galindo v. Precision Am. Corp., 754 F.2d 1212, 1221 (5th Cir. 1985); JTH Tax, Inc. v. Lee, 514 F. Supp. 2d 818, 821 (E.D. Va. 2007).

that the termite treatment was necessary to protect the lowest elevated floor and the walls of his dwelling. Pl.'s Mem. in Supp. of Mot. for Summ. J. 3-4, ECF No. 49. Other than an estimate by Priority Pest Services, Davis cites no evidence in support of his claim. Meanwhile, Nationwide has submitted a report by an independent adjuster which suggests that the home was not treated for termites prior to the November 2009 flood. See ECF No. 51 attach. 5.

Coverage A of the SFIP provides for coverage with respect to direct physical loss by or from flood to building property. 44 C.F.R. pt. 61 app. A(1), art. III(A). Termite treatment itself is a service, not an item of property. In the absence of any evidence of direct physical damage to previously treated building property by or from flood such that retreatment of the insured property is necessary, Davis has no colorable claim to coverage under Coverage A.[22]

Termite treatment does not fall within the scope of any of the three other Coverage parts of the SFIP.[23] Moreover, the SFIP

---

[22] The Court expresses no opinion as to whether coverage would respond for post-flood re-treatment of previously treated building property, but in the absence of any evidence of prior treatment, it is clear that an initial, preventative treatment is not covered under Coverage A.

[23] Coverage B of the SFIP provides for coverage with respect to direct physical loss by or from flood to personal property. 44 C.F.R. pt. 61 app. A(1), art. III(B). Coverage C of the SFIP provides for coverage with respect to debris removal, flood loss avoidance measures (e.g., sandbags, pumps), removal of insured

expressly excludes coverage for economic losses. Id. art. V(A)(7) ("We only pay for direct physical loss by or from flood, which means that we do not pay you for . . . [a]ny other economic loss you suffer.").

Accordingly, the Court FINDS that there is no genuine dispute of material fact with respect to Davis's claim for coverage of post-flood termite treatments. The Court further FINDS that Nationwide is entitled to judgment as a matter of law on this issue, as the SFIP provides no coverage for termite treatments, at least in the absence of any direct physical damage to previously treated building property by or from flood.

### 3. Vapor Barrier

Davis contends that Nationwide improperly denied his claim for coverage with respect to the removal and replacement of a vapor barrier located on the earthen floor of the crawl space below his home.[24] Davis argues that the vapor barrier was necessarily removed

---

property to a place of safety, and condominium loss assessments. Id. art. III(C). Coverage D of the SFIP provides for coverage with respect to the increased costs of repair or reconstruction of flood-damaged buildings incurred due to compliance with state or local floodplain management laws. Id. art. III(D).

[24] It is the Court's understanding that a vapor barrier may be installed across a crawl space floor to prevent soil moisture from migrating into the crawl space, but that in some cases, a vapor barrier may also be installed across the "ceiling" of a crawl space, covering the joists beneath the elevated floor and any insulation installed between them, to further insulate the floor above. See generally U.S. Dep't of Energy, Energy Savers: Crawl Space Moisture Control, http://www.energysavers.gov/your_home/ insulation_airsealing/index.cfm/mytopic=11780 (last updated Feb. 9,

and replaced to clean out debris and salt water from the crawl space and to permit the ground below to dry out, and that it is therefore covered as "clean-up" pursuant to Article III(A)(8)(b) of the SFIP.  Pl.'s Mem. in Supp. of Mot. for Summ. J. 3, ECF No. 49. Davis further argues that the vapor barrier serves to protect the lowest elevated floor of his dwelling from moisture and mold, presumably by keeping the crawl space itself dry.  See id.

The Court notes that the vapor barrier is clearly below the lowest elevated floor of an elevated post-FIRM building, and that it is not one of the several specified types of property for which limited coverage is afforded by Article III(A)(8).  See 44 C.F.R. pt. 61 app. A(1), art. III(A)(8)(a).  Nevertheless, the limited coverage afforded by the SFIP to items of property below the lowest elevated floor of an elevated post-FIRM building includes coverage for the cost of "clean-up."  See id. art. III(A)(8)(b).  Davis contends that removal and replacement of the vapor barrier was necessary to accomplish covered "clean-up" with respect to the crawl space beneath his home.

The term "clean-up" is not defined in the SFIP.  The standard dictionary definition of "clean-up" is "an act or instance of

2011); U.S. Dep't of Energy, Energy Savers: Crawl Space Insulation, http://www.energysavers.gov/your_home/insulation_airsealing/index. cfm/mytopic=11480 (last updated Feb. 9, 2011).  In this case, it is clear that the vapor barrier at issue was installed across the crawl space floor.  See Pl.'s Mem. in Supp. of Mot. for Summ. J. 3, ECF No. 49; ECF No. 51 attach. 5 (independent adjuster's supplemental report).

cleaning." Webster's Ninth New Collegiate Dictionary 247 (1989). The Court further notes that "to clean" means "to rid of dirt, impurities, or extraneous matter." Id. The Court concludes that the policy language at issue is clear and unambiguous. Pursuant to Article III(A)(8)(b), the SFIP provides coverage for costs incurred in the act of cleaning flood-damaged property below the lowest elevated floor of an elevated post-FIRM building, including the removal of dirt, impurities, or extraneous matter deposited by flood waters.[25]

In this case, however, it is unclear whether removal and replacement of the vapor barrier installed across the earthen floor of the crawl space beneath Davis's home was necessary to the act of cleaning the crawl space area. Neither party cites sufficient facts to demonstrate its entitlement to summary judgment. Davis submits only his own unsworn, conclusory allegations in support of his motion for summary judgment on this point. See Pl.'s Mem. in Supp. of Mot. for Summ. J. 3 ("The moisture barrier under the house had to be removed and replaced to clean the debris and salt water from under the house and [so that] air could be circulated with fans to let the ground dry out."), ECF No. 49. Nationwide does not

---

[25] The Court notes that this is consistent with FEMA's own interpretation of the term "clean-up." See Insurance Coverage and Rates, 65 Fed. Reg. 60,758, 60,763 (Oct. 12, 2000) (to be codified at 44 C.F.R. pts. 59 & 61) ("'Clean-up' includes the removal of muck from the interior of the insured building, cleaning the flood-soiled surfaces of the insured building, and the removal of debris from the insured property.").

even address this issue in its brief, and the only evidence it submits is an independent adjuster's report containing a vague and conclusory statement that the vapor barrier is "simply not covered," apparently because the "[v]apor barrier is not insulation when on the ground/floor of the crawl space." ECF No. 51 attach. 5.

Accordingly, the Court FINDS that neither party has demonstrated that there is no genuine dispute of material fact as to whether removal and replacement of the vapor barrier installed across the floor of the crawl space beneath Davis's home constitutes covered "clean-up" pursuant to Article III(A)(8)(b) of the SFIP. As a result, neither party is entitled to judgment as a matter of law with respect to this issue.

The Court further notes that Davis claims a total of $760.00 in damages with respect to removal and replacement of the vapor barrier.

### 4. Foundation Vents

Davis contends that Nationwide improperly denied his claim for coverage with respect to the repair and replacement of vents in the foundation walls beneath the lowest elevated floor of his home. Davis argues that these vents are an integral part of the foundation walls, noting in particular that these vents were cemented into the foundation walls, and that damage to these foundation vents is therefore covered as a specifically enumerated

item of property to which limited coverage is extended pursuant to Article III(A)(8) of the SFIP.  Pl.'s Mem. in Supp. of Mot. for Summ. J. 3, ECF No. 49.

Pursuant to Article III(A)(8), limited coverage is afforded to specified types of property located below the lowest elevated floor of an elevated post-FIRM Building.  Among these covered categories, the SFIP provides coverage for "direct physical loss by or from flood to . . . [f]ootings, foundations, posts, pilings, piers, or other foundation walls and anchorage systems required to support a building."  44 C.F.R. pt. 61 app. A(1), art. III(A)(8)(a)(17).  The Court finds this policy language to be clear and unambiguous.

In this case, however, it is unclear whether the foundation vents in question are indeed covered as an integral part of the home's foundation walls.  Neither party cites sufficient facts to demonstrate its entitlement to summary judgment.  Davis submits only his own unsworn, conclusory allegations in support of his motion for summary judgment on this point.  See Pl.'s Mem. in Supp. of Mot. for Summ. J. 3 ("The air vents that are cemented in the foundation wall was [sic] damaged and some were pulled away from the wall by breaking the concrete which was caused by the debris and salt water of the flood.  The air vents has [sic] to be replaced by cutting them out and cementing them back in.  The vents are part of the foundation walls and anchorage system required to support a building."), ECF No. 49.  Nationwide does not even

- 36 -

address this issue in its brief, and the only evidence it submits is an independent adjuster's report containing a vague and conclusory statement that the "foundation vents" are "simply not covered," apparently because the "vents are not foundation elements." ECF No. 51 attach. 5.

The Court notes that current FEMA regulations require newly constructed or substantially improved buildings with solid perimeter foundation walls enclosing crawl spaces to be designed with flood openings in the foundation walls to relieve hydrostatic loads that might otherwise cause these walls to be damaged or fail during a flood. See 44 C.F.R. § 60.3(c)(5); Fed. Emergency Mgmt. Agency, Tech. Bull. No. 1, Openings in Foundation Walls and Walls of Enclosures 2, 6-7 (2008) [hereinafter, FEMA, Tech. Bull. No. 1], available at http://www.fema.gov/library/viewRecord.do?id=1579. Although this regulation was not promulgated until 1986, several years after Davis's home was built, it is nonetheless possible that these vents are designed to serve as flood openings. See National Flood Insurance Program, 51 Fed. Reg. 30,290, 30,296, 30,308 (Aug. 25, 1986) (to be codified at 44 C.F.R. pts. 59, 60, 61, 65, 70, 73, & 76). It is also possible that these vents are mere ventilation openings intended to facilitate air flow in the crawl space area. See FEMA, Tech. Bull. No. 1, at 7. Davis's brief suggests that these vents may serve the latter rather than the former purpose, but it is also unclear whether this distinction is material,

particularly in light of the allegation that these vents were cemented into the foundation walls.

Accordingly, the Court FINDS that neither party has demonstrated that there is no genuine dispute of material fact as to whether flood damage to foundation vents cemented into the foundation walls of Davis's home constitutes "direct physical loss by or from flood to . . . foundation walls" of an elevated post-FIRM building. As a result, neither party is entitled to judgment as a matter of law with respect to this issue.

The Court further notes that Davis claims a total of $785.00 in damages with respect to repair and replacement of the foundation vents.

### IV. CONCLUSION

For the foregoing reasons, Davis's Motion for Summary Judgment (ECF No. 48) is DENIED and Nationwide's Motion for Summary Judgment (ECF No. 50) is GRANTED in part and DENIED in part. In particular, the Court grants summary judgment to Nationwide with respect to all of Davis's claims except for damages related to the removal and replacement of the vapor barrier installed across the floor of the crawl space beneath his home and the repair and replacement of vents in the foundation walls of his home.

The Clerk is DIRECTED to set a bench trial date for Davis's remaining claims.

The Clerk is further DIRECTED to mail a copy of this Opinion and Order to Davis and to counsel for Nationwide.

IT IS SO ORDERED.

UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia
September  9 , 2011